UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 13-30030 |
| ) | |
| JERI WRIGHT ) | |
| ) | |
| Defendant. ) | |

**GOVERNMENT'S SENTENCING COMMENTARY**

The United States of America, by its attorneys, James A. Lewis, United States Attorney for the Central District of Illinois, and Timothy A. Bass, Assistant United States Attorney, respectfully submits its sentencing commentary. The government states the following:

**Relevant Facts/Procedural Background**

**Wright's Indictment and Trial**

1.  On April 10, 2013, Defendant Jeri Wright was charged in an indictment with two counts of money laundering, involving the proceeds of specified unlawful activity, namely wire fraud, in violation of 18 U.S.C. § 1956(a)(1)(B)(i), two counts of making a false statement to a federal law enforcement officer, in violation of 18 U.S.C. § 1001(a)(2), and seven counts of making a false declaration to a grand jury, in violation of 18 U.S.C. § 1623.

2.  On March 7, 2014, following a jury trial, Defendant Wright was convicted

of all counts charged in the indictment.

## Wright's Criminal Conduct

### Grant Fraud

3. The following evidence was presented at trial and detailed in the government's *Santiago* proffer.

4. From July 1986 to September 2007, Regina Evans, (defendant in 12-30042, 13-30060), was employed as a police officer with the Chicago, Illinois Police Department. From 2009 to October 2011, she was employed as the Chief of Police for the Country Club Hills, Illinois Police Department. Her husband and co-defendant, Ronald Evans, was also employed as a police officer with the Chicago Police Department and later as an inspector with the Country Club Hills Police Department. The Evanses owned various for-profit and not-for-profit entities, including The Prime Time Group, Inc., Premier Entertainment Center, LLC, The Regal Theater, LLC, and We Are Our Brother's Keeper (WAOBK).

5. Defendant Wright was a resident of Chicago and close friend of Regina Evans. Defendant Wright grew up across the street from Evans and has described their relationship as being as "close to Regina Evans as a blood relative." *See* www.southtownstar.suntimes.com/news/17350834-418/records-show-jobs-aplenty-for-indicted-ex-top-cops-pals.html.

6. In or about March and April 2008, the Evanses, through The Prime Time Group Inc. and The Regal Theater, LLC, obtained financing of approximately $2,300,000

for the purchase of the Regal Theater in Chicago, Illinois. By mid-2009, the Evanses and the entities they owned were in substantial indebtedness, in financial distress, and were delinquent on the indebtedness incurred for the purchase of the Regal Theater.

7. In or about February 2009, Regina Evans, representing herself as acting on behalf of the Regal Theater's WAOBK Foundation's Pre-Apprenticeship Training Program, and with the support of certain Illinois public officials, applied for a $1,379,575 grant under an Illinois Department of Commerce and Economic Opportunity (DCEO) grant program known as the Employment Opportunity Grant Program (EOGP). According to Evans, the goal of the program was to increase the number of minorities and women entering trade union apprenticeship programs. She represented that WAOBK had developed a bridge program that would be delivered for the EOGP, and that WAOBK would target under-represented persons age 18 and older. In June 2009, DCEO awarded a $1,250,000 EOGP grant to WAOBK for a two-year term beginning on June 1, 2009, and ending on May 31, 2011.

8. As part of the grant agreement, WAOBK agreed to provide services to minorities, women, and hard-to-serve populations with the goal of expanding the number of persons who entered and completed building trades apprenticeship programs and achieved journey-level status within a building trades union. The grant agreement provided for an estimated 40 project participants, a focus on bricklaying and electrical pre-apprenticeship training and GED preparation, and a project location at the Regal Theater.

3

9. Evans submitted and caused to be submitted to DCEO a budget and scope of work, detailing the manner in which the grant funds would be expended to reflect the EOGP goals. The budget and scope of work included representations that grant funds would be expended for, among other things, personnel that would provide services to EOGP participants, contractual services related to the primary purpose of the grant, training and development for EOGP participants, the purchase of equipment, and support services for EOGP participants. The grant agreement further provided, among other things, that WAOBK would exercise due diligence in expending grant funds and would do so according to the grant's terms, including the requirement that WAOBK submit a budget and work plan to reflect the objectives and goals of the EOGP, and according to generally-accepted sound, business practices and arms-length bargaining.

10. In addition, WAOBK was required to establish safeguards to prohibit officers, directors, agents, employees, and family members from using positions of employment for the purpose of private gain for themselves or others and to structure its financial management system to provide for accurate, current, and complete results of the grant project. Finally, WAOBK was required to submit quarterly reports to DCEO, reporting the manner in which the grant was being administered and the manner in which grant costs were incurred and grant funds were being used, and to cooperate with DCEO in its monitoring of WAOBK's grant performance and to submit an annual audit to DCEO.

11.     On or about September 10, 2009, DCEO disbursed the entire $1,250,000 in grant funds by issuing a State of Illinois check for that amount to Evans in Springfield, Illinois.

12.     As charged in the indictment against Evans and Ronald Evans in this district in 12-30042, to which Evans has pleaded guilty, Evans's solicitation and receipt of a $1,250,000 grant from DCEO was a complete fraud from the outset. Beginning in approximately February 2009 (the date of application for the DCEO grant) and continuing to approximately June 2010 and beyond, Evans knowingly conspired with her husband and others (including Defendant Wright) and devised and participated in a scheme with others to: (1) defraud the State of Illinois, including DCEO, and to obtain its money and property by means of false and fraudulent pretenses, representations, promises, and material omissions, through interstate wire communications; (2) engage in money laundering involving the proceeds of the wire fraud; and (3) to ultimately obstruct justice and engage in witness tampering.

13.     In addition to Evans and Ronald Evans (who pleaded guilty pursuant to a plea agreement to charges of wire fraud and money laundering), other conspirators and participants in the scheme were Defendant Wright, Ricky McCoy, Regina Evans's brother (who pleaded guilty pursuant to a plea agreement, in No. 13-30029, to money laundering and obstruction of justice), and two other currently uncharged persons, Ashley Simon and Charlton McKay, both friends and associates of the Evanses.

14. As part of the conspiracy and scheme, Evans and others::

• solicited and obtained a $1,250,000 EOGP grant from DCEO, representing that such funds would be used for their intended purposes, when in fact, as she and others well knew, she intended to and did convert and cause to be converted as much as $917,194 to the personal use and benefit of the Evanses, to the use and benefit of businesses they owned, including The Prime Time Group, Inc. and The Regal Theater, LLC, and to the use and benefit of their family members, friends, and associates, including McCoy, Defendant Wright, Simon, and McKay.

• falsely represented to DCEO that WAOBK would provide services to EOGP participants, when in fact, as Evans and others, including Defendant Wright, well knew, little, if any, of the EOGP training would be or was completed.

15. One of the many false representations made to DCEO as part of the grant application was a statement relating to personnel. The statement falsely represented, among other things, that Defendant Wright and Simon would serve as Program Coordinators and McKay would serve as Program Manager/Development Manager. In addition, another statement submitted to DCEO was a contractual agreement signed by Defendant Wright, dated June 1, 2009, between her and WAOBK. The contractual agreement was false and represented that Defendant Wright would, among other things, establish a mentoring program for EOGP participants and provide basic skills instruction for program participants. The contract further provided that Defendant Wright would be paid $3,977 per month for a 12-month period. Defendant Wright was never a Project Coordinator and performed no work for the grant.

16.     As a further part of the scheme, the Evanses and others:

• fraudulently concealed the Evanses true financial status and that of their various business interests from DCEO and their intent to use a substantial portion of grant funds (totaling more than $200,000) shortly after their disbursement for the repayment of indebtedness, including delinquent mortgage indebtedness for the Regal Theater, which, by the time of the disbursement of grant funds, was the subject of a foreclosure action in Cook County, Illinois.
• caused the $1,250,000 in grant funds to be split into six separate accounts at the same financial institution, then caused more than $500,000 in such funds to be deposited to the Regal Theater bank account, and then used nearly $275,000 of those funds for debt repayment, all within six months of the initial grant disbursement.
• caused more than $135,000 in grant funds to be transferred to their personal bank account, which were then commingled with other funds and used for cash withdrawals and personal and other expenses, including the repayment of additional indebtedness.
• caused more than $50,000 in grant funds to be disbursed to the use and benefit of the Evanses family members, friends, and associates, including Defendant Wright.

17.     The evidence the government presented at trial to establish the fraud included the testimony of DCEO officials and others, including Ronald Evans and Ashley Simon, and DCEO and other records, including financial records and bank statements. Summary exhibits of the diversion of grant funds were presented at trial.

18.     As a further part of the scheme, Evans submitted, through wire communications, quarterly reports to DCEO, falsely representing the manner in which

grant funds were spent and refused to cooperate with DCEO in its efforts to monitor WAOBK's performance under the grant program. On March 4, 2010, in response to a request from DCEO as part of the monitoring of the grant, Evans submitted additional false information. That information included the submission again of the contract with Defendant Wright, falsely representing that she was a Project Coordinator for the grant. The testimony of Ronald Evans at trial established that Wright participated with Evans in the creation of the false documents provided to DCEO.

Money Laundering

19.    It was a further part of the conspiracy and scheme that from September 2009, after the grant funds were disbursed to Evans, to February 2010, Evans, Ronald Evans, Defendant Wright, McCoy, and others, including Simon and McKay, caused more than $100,000 in checks to be made payable to McCoy, Defendant Wright, and others, purporting to be for work done under the WAOBK grant, when in fact the Evanses and others, including Defendant Wright, intended to convert and did convert grant funds to their personal use and to the use of the businesses the Evanses owned. They did so by causing the checks to be cashed at the WAOBK bank and depositing more than $60,000 in cash from the proceeds of the checks back into accounts controlled by the Evanses. Some of the checks were authored by Defendant Wright. These transactions were summarized in the summary exhibit presented at trial.

20.    Specifically, as to Defendant Wright, on November 10, 2009, Ronald Evans and McCoy issued two checks to Defendant Wright of $7,955.58 and $11,933.36,

8

respectively, totaling $19,888.94, purporting to be payment for work performed. Rather than going to her own bank and depositing the funds from the checks, Defendant Wright then went with Evans to Evans's bank and cashed the checks. They then caused $17,888.94 to be deposited back into the Evanses' personal bank account and obtained $2,000 in cash. This transaction was charged in Count 1 of the indictment.

21.    On or about November 28, 2009, Ronald Evans and McCoy issued two additional checks to Defendant Wright, both in the amount of $3,977.77, the same dollar amount as that set forth in the false contract signed by Defendant Wright months earlier. Once again, Defendant Wright and Evans went to the WAOBK bank and cashed the checks and caused $2,000 to be withdrawn in cash. Two days later, Defendant Wright deposited $2,200 in cash into her own bank account at a separate bank. This transaction was charged in Count 2.

22.    On or about February 2, 2010, Evans and Ronald Evans issued checks to McCoy, McKay, and Robert Stampas and a check of $3,977.00 to Defendant Wright, purporting to be payment for work performed. On that same date, and within less than one-half hour, all of the checks were cashed at the WAOBK bank.

23.    In addition, as to Simon, the Evanses issued her three checks of $3,583, $10,749.99, and $3,583, all purporting to be for work performed, $5,000 of which was deposited into the Evanses' personal bank account and the balance converted to cash. Simon performed no work under the grant and returned the cash generated from the transactions to Evans.

24. Finally, as to McKay, the Evanses and McCoy issued four checks to McKay, totaling $20,377.74, with $4,000 of the proceeds from the checks deposited into the Evanses' personal bank account. One of the checks was written by Defendant Wright. McKay provided some security at the Regal Theatre but performed no work as a Program Manager/Development Manager.

25. As a result of the conspiracy and scheme, Evans and others caused a loss of more than $900,000 to the State of Illinois and to the under-represented minority and women populations, for whom the grant program was intended to serve. In June 2010, after DCEO identified the potential fraud and made demand for the return of all of the grant funds, Evans returned $332,806 in grant funds to DCEO that remained unspent.

<u>Obstruction of Justice/False Statements and Testimony</u>

26. Following the return of the first superseding indictment against Evans in June 2012 in No. 12-30042, and Evans's release on bond, the grand jury investigation continued and related to unindicted offenses and persons, including the money laundering offenses charged against the Evanses in a third superseding indictment and in the subsequent indictments involving Defendant Wright and McCoy. The investigation included a review of the more than $100,000 in checks described above and made payable to Defendant Wright, Simon, McCoy, and McKay.

27. Beginning in early 2012, and continuing to on or about March 21, 2013, after Evans was first indicted, Evans, Simon, McCoy, Defendant Wright, and McKay continued to engage in the conspiracy and scheme by conspiring to obstruct justice and

10

make false statements to federal law enforcement agents and the federal grand jury. In early 2012, Evans contacted McCoy and told him that the "feds" were investigating her and Simon. Evans falsely stated to McCoy that Simon worked on the grant and wanted him to say so.

28. Law enforcement agents interviewed Simon on March 23, 2012, and December 5, 2012. She also testified before the grand jury on February 7, 2013. During the interviews and grand jury testimony, Simon repeatedly made false statements concerning the grant and the checks she received from WAOBK. She stated that she was an instructor for the grant and was paid for her work. Simon later acknowledged that those statements were false and that she did no work on the grant, she did not receive any funds from the checks, and she deposited part of the funds into Evans's personal account and returned the remaining funds to Evans. Between March 2012 and March 2013, Evans repeatedly met with or spoke to Simon and instructed her to provide a false story to agents and the grand jury. Some of those conversations were recorded. As Evans put it, in just one of her repeated statements in counseling Simon to lie to the grand jury, "if we're consistent and keep the same story, there's nothing nobody else can do." During another meeting between Evans, McCoy, and Simon, McCoy assisted Evans in encouraging Simon to lie to the grand jury.

29. Agents interviewed McKay on February 27, 2013, and issued him a grand jury subpoena for appearance on March 7, 2013. McKay stated that after being released from jail, Evans contacted him and offered him a job as a security guard at the Regal

Theatre. He falsely represented to agents that Simon filled in for him doing security work at the theatre for the grant program. McKay further falsely stated that Defendant Wright may have taught classes and helped on the grant. He denied being coached or asked to lie. During a subsequent interview, after retaining counsel, McKay admitted that the weekend prior to his grand jury appearance, Evans approached him at his place of employment and asked him to tell investigators the false story concerning Simon.

30.     Defendant Wright was interviewed by law enforcement agents on March 29, 2012, August 2, 2012, October 12, 2012, and November 7, 2012. Prior to the first interview in March 2012, Evans asked McCoy to contact Defendant Wright and advise Wright to contact Evans about the investigation.

31.     During the interviews, Defendant Wright stated that she was hired by WAOBK as a consultant and admitted that she signed the contractual agreement with WAOBK, but that she did not perform any of the work listed under the contract or WAOBK grant. Defendant Wright stated that she worked approximately 60 hours per week from her residence, performing work for the Evanses' security company, "brainstorming" with Evans, running errands for Evans, and proofing Evans's doctoral dissertation. She also admitted to knowing Ronald Evans, McCoy, Simon, and McKay.

32.     Defendant Wright repeatedly made false statements to federal law enforcement agents. For example, during the August 2, 2012, interview, Defendant Wright stated that she received the checks from WAOBK for her work; the $11,933 check to her from WAOBK was for three months of back pay; and she used the money

to catch up on her mortgage. The August 2, 2012, statements were charged in Count 3. In addition, during the October 12, 2012, interview, Defendant Wright stated that she believed she deposited the $11,935 and $7,955 checks into her personal bank account at Chase Bank, and that she used the funds to catch up on her car note and home note. When agents explained to Defendant Wright that WAOBK bank records revealed that the funds were deposited into Evans's personal account, Defendant Wright stated that she was fairly sure that she used the funds to pay her bills but would check her records. She denied that Evans asked her to negotiate checks and return cash to Evans. Agents allowed Defendant Wright to take a photograph of the WAOBK checks so that she could check her records.

33.     Defendant Wright appeared before the grand jury on November 7, 2012. Prior to her appearance, agents interviewed her and again asked about the WAOBK checks. Defendant Wright falsely stated that she received all of the cash from the checks. Prior to being asked any questions, Defendant Wright was advised that she had a right not to answer any question that might incriminate her. During the grand jury testimony, she repeatedly made false statements to the grand jury concerning the financial transactions charged in Counts 1 and 2 and again stated that she needed to review her records. Those statements were set forth in detail in Counts 5 through 11 of the indictment. At the end of her testimony, Defendant Wright was given the opportunity to return home and again review her records and advised that her grand jury subpoena would be continued and that she would be required to return the

13

following month to continue her testimony. Defendant Wright's own financial records, which the government presented at trial, reflect that she did not use the funds from the WAOBK checks to pay bills or to pay her car or mortgage loans.

34.    In February 2013, Defendant Wright, through her counsel, was subpoenaed to appear before the grand jury a second time on March 7, 2013. Prior to the required appearance date, Defendant Wright's counsel at that time (who is not her current counsel) contacted the government and left a recorded message. Defendant Wright's counsel stating that Defendant Wright was "adamant" and "she's not going to alter her testimony any more than to provide any further or better recollection that she may have after, you know, the information she collects from the bank between now and Thursday." Counsel further stated that "any attempt to convince her that her recollection is incorrect or what she testified to before was incorrect is, is futile, um, that's not her position, that's not what she believes the truth is, so she, she's going to testify consistent with what she said up to now and she also is confident that, that um, some point she'll be able to demonstrate through record, um, that she deposited those monies that she took from Chase bank, um, into either her business account or her personal account, um, that's her position, that's our position."

## The PSR

35.    The revised presentence report (PSR) provides that Defendant Wright's final offense level is 18 and her criminal history category is I, resulting in an advisory Sentencing Guidelines range of 27 to 33 months of imprisonment. The offense level

calculation is based on a loss/money laundering amount of more than $30,000 but less than $70,000 under USSG §§ 2S1.1, 2B1.1(b); and an aggravating enhancement because Defendant Wright obstructed justice, USSG § 3C1.1; and because she is not entitled to a reduction for acceptance of responsibility, USSG § 3E1.1.

## Government's Objections

36.     The government has no objections to the PSR.

## Defendant's Objections

37.     Defendant Wright has no objections to the PSR.

**Defendant's Additional Criminal Conduct/Basis for Upward Deviation**

38.     USSG. § 5K2.0(a)(1) provides that: "The sentencing court may depart from the applicable guideline range if . . . there exists an aggravating or mitigating circumstance . . . of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that, in order to advance the objectives set forth in 18 U.S.C. § 3553(a)(2), should result in a sentence difference from that described." The Sentencing Guidelines, specifically USSG § 3C1.1 (obstruction of justice), do not address the situation of multiple enhancements involving a defendant who commits an additional felony offense while on pre-trial release and then provides false information to the Court in response to a petition to revoke that release.

39.     "Since *Booker* [the Seventh Circuit has] repeatedly emphasized that formal departure analysis is obsolete." *United States v. Brown*, 732 F.3d 781, 783 (7th Cir. 2013).The advance notice requirements under Fed.R.Crim.P. 32(h) do "not apply to an

upward variance from the advisory guidelines range." *Id.*; *see also United States v. Cruz*, 2015 WL 3454353, at *2 (7th Cir. June 1, 2015). Even with an upward deviation, a sentencing court is required to impose a reasonable sentence. *See Brown*. 732 F.3d at 788.

    40.    In this case, as set forth in the PSR and as presented to the Court during bond revocation hearings on February 11, 13, and 23, 2015, Defendant Wright, while on pre-trial release, including in part during her criminal trial, engaged in additional criminal conduct be committing felony theft in a manner similar to the conduct for which she was convicted in the instant case. Specifically, Defendant Wright fraudulently submitted documents to Elmwood Staffing and Berry Plastics in Franklin, IN, falsely representing that she was an employee for Berry Plastics, when in fact she was no such employee. As a result of this additional felony offense, Defendant Wright fraudulently received 18 paychecks between February 12, 2014, and May 28, 2015, from Elmwood Staffing, totaling $8,192, which caused Berry Plastics to reimburse Elmwood Staffing a total of $10,560.

    41.    During the bond revocation hearings, this Court and the government repeatedly gave Defendant Wright an opportunity to acknowledge the bond violation without admitting any guilt to any potential criminal charges, but she declined. During the initial bond hearing, counsel for Defendant Wright represented to the Court that she would prove that she in fact did work at Berry Plastics. During the final bond hearing on February 23, 2015, Defendant Wright submitted false documents to the Court, again representing to the Court that she performed work for Berry Plastics. Defendant Wright

16

persisted in the presentation of these documents after the government advised her and her counsel that the government believed the submission of the documents was a false statement and potentially obstruction of justice.

## Government's Sentencing Recommendation

42.     In sentencing a defendant, the sentencing court is first required to properly calculate the advisory Sentencing Guidelines range. *United States v. Jones*, 696 F.3d 695, 700 (7th Cir. 2012). After calculating the advisory Sentencing Guidelines range, the sentencing court must then consider the factors set forth in 18 U.S.C. § 3553(a). *See Jones*, 696 F.3d at 700. Those factors include the nature and circumstances of the offense, the history and characteristics of the defendant, and the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant, and the advisory Sentencing Guidelines range.

43.     In this case, Defendant Wright chose to participate in a substantial scheme organized by Regina Evans to defraud the State of Illinois and the intended beneficiaries of the State's grant program and to launder its fraudulent proceeds, which caused an intended loss of $1,000,000, likely never to be fully recovered by the victim of the offense. Defendant Wright's offenses were not an isolated or anomalous incident, but rather were the result of her voluntary decision to join and then remain a part of that planned and ongoing criminal activity. She not only defrauded the State of Illinois, but also betrayed the very minority and under-privileged community she is now telling the Court she has

17

previously served.

44.     Moreover, when Defendant Wright was made aware of the investigation of the criminal activity and advised that she was not a target of the investigation, she voluntarily chose again to commit additional and repeated criminal activity by engaging in a pattern of obstruction of justice --- criminal activity that only ended, not by her choice (even after retaining counsel), but instead by her indictment.

45.     Finally, while on pre-trial release for the offenses charged in the indictment, Defendant Wright voluntarily chose for a third time to engage in additional and repeated criminal activity by committing the felony offense of theft, in part while she was on trial for the instant offenses. When she was made aware of the investigation of that offense and the filing of a petition to revoke her bond, Defendant Wright made a fourth and final voluntary choice to engage in additional obstructive conduct, this time directly to this Court, by submitting a fraudulent document to the Court and falsely representing that she did not commit any theft.

46.     The government has considered the factors set forth in § 3553(a), which it will discuss more fully at sentencing, and intends to move for a two-level upward deviation from the Guidelines range to a final range of 33 – 41 months of imprisonment. The government intends seek this upward variance due to Defendant Wright's additional criminal conduct while on pre-trial release, which is not considered or taken into account by the Sentencing Guidelines. The government intends to recommend an above-Guidelines sentence of 36 months imprisonment. Such a sentence will

appropriately address the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence to criminal conduct, and protect the public from further crimes of Defendant Wright, which, by her own conduct, she has demonstrated she will continue to commit. It also is a sentence that Wright has earned.

        Respectfully submitted,

        JAMES A. LEWIS
        UNITED STATES ATTORNEY

BY:    s/Timothy A. Bass
        Timothy A. Bass, Bar No. MO 45344
        Assistant United States Attorney
        318 S. Sixth Street
        Springfield, IL 62701
        Phone:  217/492-4450
        Fax: 217/492-4044
        tim.bass@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that on the 24th day of June 2015, I filed the foregoing directly with the Clerk of Court using the CM/ECF system, which will send notice to the following:

Counsel of record

                                                s/Timothy A. Bass
Timothy A. Bass, Bar No. MO 45344
Assistant United States Attorney
318 S. Sixth Street
Springfield, IL 62701
Phone: 217/492-4450
Fax: 217/492-4044
tim.bass@usdoj.gov